By the Court. Campbell, J.
In March, 1847, Congress passed an act, by which certain proposals which had been previously made for carrying the United States mail between Hew York and Liveiqoool, and Hew York and Hew Orleans, by way of Havanna, were accepted, and contracts were authorized to be made to carry into effect the purposes of the government. We shall have occasion to allude hereafter, in the course of this opinion, to the various provisions of this act, and to what was manifestly the intention of Congress in its passage. By the fifth section of this act, the secretary of the navy was directed to make a contract for carrying the mail between Panama and some port in the territory of Oregon. In the performance of .that duty, the navy department advertised for proposals, and among the persons offering to make á contract for this service, was the defendant, Harris. On the 4th of July, 1847, Harris entered into an agreement at the city of Washington, with the complainant, which, after reciting that it was understood that the proposal of *274 Harris would "be accepted, provides that upon certain conditions and for certain considerations therein expressed, Harris should assign the contract, when executed, to Woodward, the complainant. This agreement of the 4th of July, was signed by Harris alone. The bill in this cause was filed to enforce a specific performance of this agreement. After setting forth the agreement and the proposals of the navy department, it charges that the defendant Harris, after entering into the contract with the government, assigned such contract to the other defendant, Aspinwall, in violation of the previous agreement with the complainant, and that the defendant, Aspinwall, received such assignment with the knowledge of such previous agreement.
To this bill, separate demurrers were interposed by the defendants, and several grounds of demurrer were stated, which we shall proceed to consider. They may, however, we think, be arranged under three heads. 1st. The agreement having been signed by Harris alone, cannot be enforced, as there is no mutuality ; and 2d, if there was mutuality, yet this contract with the government, even though its assignment may not be contrary to public policy, is of such a character, that a specific performance of an agreement for its assignment cannot be enforced, unless a previous express assent of the government to such assignment had been first obtainedj and that the bill does not charge, nor is it pretended that the government had agreed or expressed in any way their willingness to give such assent; and lastly, that at the time of filing the bill, the contract had been assigned to the defendant Aspinwall, with the assent of the government, and that other persons who' are not parties in this suit, had become interested, either as sureties or otherwise, and whose rights would be prejudiced, if a specific performance should now be enforced.
This cause was twice argued before us, with great ability, and we have given to the questions which we were called' upon to consider, that careful reflection which is due alike to their interesting character, and to the magnitude of the. interests involved in their final decision.
At common law, every contract for the sale of an article, where there was no actual transfer, was treated as a personal *275 contract or covenant, and there was no redress for its breach, save in damages; thus allowing the party sought to be charged, the alternative of withholding the specific article bargained for, or compensating in damages at his own election. Courts of equity, deeming such a course inadequate for the purpose of justice, have interfered and required the offending party to perform strictly his covenants, and yield up specifically the article which he could not withhold, without injury or fraud. (2 Story’s Eq. Jur. § 714.) “ Specific performances were early enforced, especially of contracts relating to land, though, from time to time, doubts were expressed as to those relating alone to personal estate. But notwithstanding this distinction between personal contracts for goods and contracts for lands, is to be found laid down in the books as a general rule, yet there are many cases to be found, where specific performance of contracts relating to personalty, have been enforced in chancery, and courts will only weigh with greater nicety contracts of this description, than such as relate to lands. (Mechanics’ Bank of Alexandria v. Seaton, 1 Peters 299.) It was objected, however, that even if courts would decree the specific performance of contracts relating to personal estate, that power of the court could not be invoked in this case, because the agreement was not mutual, being signed only by the defendant Harris.
It is true, that in Benedict v. Lynch, 1 John. Ch. R. 376, Chancellor Kent remarked, “ That it had been ruled in several cases, that a bill for a specific performance will not be sustained, if the remedy be not mutual, or where one party only is bound by the agreementand he quoted the doctrine of Lord Redesdale, so often referred to in Lawrenson v. Butler, 1 Schoales & Lefroy 13. It is to be remarked, however, that the chancellor observed in Benedict v. Lynch, that the decision could be placed with more satisfaction upon the intrinsic merits of the case, and indeed it appears to have been so placed. That decision was made in 1815. The question afterwards arose in 1817, in the court of errors, in the case of Clason v. Bailey, 14 John. Rep. 484, and was there discussed by the same learned chancellor at length, and with his usual distinguished ability and learning, and he referred to and commented upon the various *276 cases which had been decided in the English courts of law and equity. Though still entertaining his original opinion, and remarking-that the weight of argument was in favor of the construction, that the agreement to be enforced in equity, should be mutually binding, he says, there is nothing to disturb the strong and united current of authority on the other side, except the observation of Lord Redesdale, in Lawrenson v. Butler, and he concluded his remarks upon this branch of the case, by saying, “ The remedy, therefore, in such cases is not mutual. But notwithstanding this objection, it appeal's from the review of the cases, that the point is too well settled to be now questioned.” The language of the vice-chancellor, In the matter of Hunter, 1 Edward Ch. R. 1, is also explicit. “ The court may, therefore, in a proper case, where there is a covenant on one side and no mutuality, decree a performance.” This doctrine was again affirmed in the case of McCrea v. Purmort, 16 Wendell 460, and several of the decisions heretofore referred to are quoted and approved.
In the case of Flight v. Bolland, 4 Russell 298, a bill was filed by an infant for a specific performance, and it was dismissed by the master of the rolls for want of mutuality; that is, that a specific performance could not be enforced against an infant, and hence should not be enforced in his favor. But he adds, “ The plaintiff’s counsel principally rely upon a supposed analogy afforded by cases under the statute of frauds, where the plaintiff may obtain a decree for specific performance of a contract signed, by the defendant, although not signed by the plaintiff. It must be admitted that such now is the settled rule of the court, although seriously questioned by Lord Redesdale, upon the ground of want of mutualityand he adds, “that these cases are supported, because the statute of frauds only requires the agreement to be signed by the party to be charged, and that the filing of the bill renders the agreement mutual.” In Adderley v. Dixon, 1 Sim. and Stu. 607, a bill was filed by the vendor of certain debts due to a bankrupt’s estate, and the vice chancellor says, “ Courts of equity decree the specific performance of contracts, not upon any distinction between realty and personalty, but because damages at law may not in the partieu *277 lar case afford a complete remedy,” and in the same case he adds, “ It is true, that the present hill is not filed by the purchaser, but by the vendor, who seeks not the uncertain dividends, but the certain sum to be paid for them. It has, however, been settled by repeated decisions, that the remedy in equity must be .mutual, and that where a bill will lie for the purchaser, it will also lie for the vendor.” In other words, when a contract is executed by both parties, if one party could file a bill for specific performance, the court will also allow the other party to file his bill, and will not put him to his action at law. There must be something to be done by each party. The agreement must be made by parties competent to contract. It must be mutual in its general scope and objects. In the language of Lord Hardwicke, in Buxton v. Lister, 3 Atkyns, 383, the agreement should be certain, fair, and just, in all its parts, and it should also be signed by the party sought to be charged. Courts of equity have not hesitated to enforce specific performance of agreements possessing these attributes, whether relating to lands or personal estate, and the decisions in England and our own country, from the time of the decision in Buxton v. Lister in 1746, to the present time, have flowed in one almost uniform and strong current. The objections in this case, that this contract is not signed by the complainant, Woodward, and cannot, therefore, be enforced, because it is not in that respect mutual, we consider not well taken; and if that was the only objection, we might, and perhaps ought, to decree a specific performance.
We come now to the consideration of the act of Congress of March, 1847. Its provisions are various, though one object is apparent throughout, and for its attainment the act was passed. That object was the formation and building up a more extensive and powerful navy, • especially in steam vessels of war, and in steam vessels capable of being easily converted into vessels of war. Its first section provides for the building by the government of four steam vessels of war. In other sections, contracts are authorized, which would insure the building, by private persons, of eight more steam vessels, each of which were to carry a certain number of midshipmen of the navy of the United *278 States, and a portion of which were to be commanded by officers of the same navy. The 5th and 6th sections are as follows:
“ Sec. 5. And be it further enacted, that it shall be the duty of the secretary of the navy to contract, on behalf of the government of the United States, for the transportation of the mail from Panama, to such port as he may select in the territory of Oregon, once a month each way, so as to connect with the mail from Havana to Chagres, across the isthmus, said mail to be transported in either steam or sailing vessels, as shall be deemed most practicable and expedient.”
“ Sec. 6. And be it further enacted, that it shall be the duty of the secretary of the navy, to provide in the contracts authorized by this act, that the navy department shall at all times exercise control over said steamships, and at any time have the right to take them for the exclusive use and service of the United States, and to direct such changes in their machinery and internal arrangements as the secretary of the navy may require; due provisions being made in the said contracts for the mode of ascertaining the proper compensation to the contractors thereof.”
It was under section 5 of this act, that the contract was made with the defendant, Harris. The bill charges that the contract made with Harris, was assigned by him to the defendant, Aspinwall; and as it is notorious that the steamships of the latter are now running from Panama to California and Oregon, carrying the mail of the United States, we must infer that the proposals made by Harris, were for carrying the mail in steamships, and not in sailing vessels; and, indeed, it appears by the agreement, that such was the proposal, though the vessels are called in such agreement, steamboats.
The 6th section of the act would then apply to these steamships. The navy department, by the terms of the contract, must be authorized at all times to exercise control over such steamships, and to have the right to take them for the use of the United States, and to direct changes in their machinery and internal arrangements, &c. The business of the contractor, as *279 was well observed on the argument, is quasi official. It is not a mere mail contract, in which the only question which might arise, would be, whether the mail should be carried on horseback, or in a four horse coach. But it was a contract, whereby the contractor, for a large consideration, paid, or to be paid, by the government, was not only to transport the mail upon distant seas, but was also to famish the government with the ready means of organizing an efficient steam navy for the protection of the commerce of the republic, and of her citizens settled on the shores of the Pacific. Hence, in the advertisement of the secretary of the navy, he reserves to himself the right to select the proposals which he may prefer. He would not agree to accept the lowest bid. He might wish to look to the man who made the proposals, to the sureties which he offered, and judge from their character and condition whether he had the requisite skill and ability to cany out the project; in short, whether he would be likely to prove a useful and efficient auxiliary to the government, in executing a new and expensive enterprise. Looking at the provisions of this act, and to the objects sought to be attained, and to the advertisement of the navy department, we do not think that the agreement for the assignment of the contract, is such an agreement as this court, in the exercise of a prudent and careful discretion, could be called upon to enforce specifically, unless it appeared that the sanction of the government to such assignment had been previously obtained. This is not alleged or pretended; nor is it alleged that it would have been given, had not the assignment been made to Aspinwall. The bill shows that the assignment was made to Aspinwall, and, as may be fairly inferred from the allegations contained in the bill, with the knowledge and approbation of the navy department.
There remains one other objection, which was urged against a decree for a specific performance, and that is, that the parties in interest have changed since the agreement was made between Woodward and Harris, and other persons have become interested who were known to the complainant at the time of filing his bill, and who were not made parties thereto. The bill alleges, that Edgar Howland, the partner of Aspinwall, became, with Aspin *280 wall, one of the sureties for Harris to the government, immediately preceding the assignment of the contract by Harris to Aspinwall. We must infer that Mr. Howland became such surety because it was agreed and understood that the contract was to be assigned to his partner, and relying upon the skill and ability of that partner to protect him as surety from loss. The amount of the bond appears to have been one hundred thousand dollars, and as the expenditures would necessarily amount to many hundreds of thousands of dollars, and the contract was to continue for several years, it may well be assumed that Mr. Howland would not enter into the obligations of a surety, without the most ample protection in his own judgment, either in the ability and integrity or superior skill of the principal. The bill now seeks to compel Aspinwall to assign to the complainant the contract assigned to him by Harris, and contains a general offer to indemnify Mr. Howland against his liability as surety. We are clearly of opinion that Mr. Howland would not be thus compelled to remain as surety under circumstances entirely different from those which existed, when he signed the bond. There is no allegation in the bill that Howland had any knowledge or information, when he signed the bond, that there was any such agreement as is set up in the complainant’s bill.
We must allow the demurrers; and as we are of opinion that a specific performance of the agreement set up, ought not to be enforced without the direct sanction of the government, and no such sanction being shown or pretended, we cannot retain the bill for the purpose of allowing the complainants to seek through these proceedings compensation in damages.
The demurrers must be allowed with costs.